UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ANGELA SILVELS,                    )
            Plaintiff,             )
                                   )    No. 1:04-CV-278
v.                                 )
                                   )    COLLIER/LEE
JO ANNE B. BARNHART,               )
  Commissioner of Social Security, )
            Defendant.             )

## REPORT AND RECOMMENDATION

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final

decision of the Commissioner of Social Security denying the plaintiff's claim for Disability

Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under Titles II and XVI of the

Social Security Act, 42 U.S.C. §§ 416(I), 423, and 1382.

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b)

of the Federal Rules of Civil Procedure for a report and recommendation regarding the disposition

of Plaintiff's motion for judgment on the pleadings [Doc. No. 16] and Defendant's motion for

summary judgment [Doc. No. 19].

For the reasons stated herein, it is **RECOMMENDED** that the decision of the Commissioner

be **AFFIRMED**, Defendant's motion for summary judgment be **GRANTED**, Plaintiff's motion for

judgment on the pleadings be **DENIED**, and the case be **DISMISSED**.

## Administrative Proceedings

Plaintiff filed her DIB and SSI applications on July 31, 2000, alleging that she became

disabled on July 1, 2000 (Tr. 88-91, reconstructed application), because of arthritis pain in her arms

and legs, and sleep apnea (Tr. 88). The state agency denied her applications initially and on

reconsideration (Tr. 76-77). Plaintiff requested a hearing (Tr. 83-84). On June 26, 2003, Plaintiff appeared with counsel, and testified at a hearing before Administrative Law Judge ("ALJ") Richard W. Gordon (Tr. 295-316). Robert Bradley, a vocational expert, also testified (Tr. 310-15). On April 12, 2004, Plaintiff appeared with counsel and testified at a supplemental administrative hearing before ALJ Gordon (Tr. 317-35). Dr. Edward Griffin, a medical expert, and Dr. Van Freedlove, a vocational expert, also testified (Tr. 320-34). On May 10, 2004, ALJ Gordon denied Plaintiff's disability applications (Tr. 9-19). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review (Tr. 5-7). Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff seeks judicial review of the Commissioner's final decision.

<u>Standard of Review</u>

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were supported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence

standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston V. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted).

<u>How Disability Benefits Are Determined</u>

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that disability claims are evaluated by way of a five-step sequential analysis. 20 C.F.R. § 404.1520. The five-step analysis is sequential because if, at any step, the claimant is found to be not disabled or to be disabled, then the claim is reviewed no further. 20 C.F.R. § 404.1520(a). The following are the five steps in the analysis:

Step 1: Is claimant engaged in substantial gainful activity? If so, claimant is not disabled. 20 C.F.R. § 404.1520(b).

Step 2: Does claimant have a "severe" impairment or combination of impairments that significantly limits claimant's ability to do basic work activities, and will foreseeably result in death or last at least twelve months? If not, claimant is not disabled. 20 C.F.R. §§ 404.1509,

3

404.1520(c), 404.1521.

Step 3:  Does the claimant's impairment meet or equal the criteria of an impairment described in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1?  If so, the claimant  is disabled, and the analysis may end without inquiry into the vocational factors.  20 C.F.R. § 404.1520(d).  If inquiry is made into vocational factors, after step three but before step four, the Commissioner evaluates a claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e)-(f); 404.1545.

Step 4:  Does claimant's RFC permit claimant to perform claimant's past relevant work?  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(f).

Step 5:  Does the claimant retain the RFC to perform other work in the economy?  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(g).

The burden of proof is upon the claimant at steps one through four to show disability.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999).  Once the claimant has demonstrated the extent of claimant's RFC at step four, the burden shifts to the Commissioner to show that there is work in the national economy that may accommodate claimant's RFC.  *Id.*

<u>ALJ's Findings</u>

The ALJ concluded at step five of the sequential analysis that Plaintiff was not disabled because she could perform work existing in significant numbers in the national economy (Tr. 12-19).  The ALJ made the following findings in support of the decision:

1.    The claimant meets the disability insured status requirements of the Act through at least the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since July 1, 2000.

3.    The claimant has "severe" impairments, as described in the decision, but does not

4

have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.     The claimant's subjective complaints are not fully credible.

5.     The claimant has the residual functional capacity to perform sedentary work activity involving simple one and two-step procedures.

6.     The claimant is unable to perform any past relevant work and has no transferable work skills.

7.     The claimant is 37 years old, which is defined as a younger aged individual.

8.     The claimant reports a high school education.

9.     Based on an exertional capacity for sedentary work and the claimant's age, education, and work experience, 20 C.F.R. §§ 404.1569 and 416.969 and Rule 201.28, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

10.     Although the claimant's additional nonexertional limitations do not allow the claimant to perform the full range of sedentary work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national and regional economies which the claimant could perform. Examples and numbers of such jobs were identified by a vocational expert at the hearing.

11.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 18). Such findings are conclusive if they are supported by substantial evidence in the record. *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Wokojance v. Weinberger*, 513 F.2d 210, 212 (6th Cir. 1975). The sole function of this Court is to determine whether the Commissioner's decision is based upon such evidence. *Plank v. Sec'y of Health & Human Servs.*, 734 F.2d 1174, 1176 (6th Cir. 1984); *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Supreme Court has defined substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 92 S. Ct. 1420, 1427 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)).

Issues for Review

Plaintiff contends the ALJ erred at step five of the disability analysis when he found the Plaintiff had the RFC to perform light and sedentary work activity because the ALJ failed: 1) to properly develop the record by not ordering intelligence testing; and 2) the ALJ did not properly weigh treating source opinions, [Plaintiff's Brief at 4-7 ("Pl. Br.") Doc. No. 17].

Review of Evidence

*Plaintiff's Age, Education, and Past Work Experience*

Plaintiff was 37 years old at the time of her second administrative hearing and on the date of the ALJ's decision (Tr. 297). She graduated from high school (Tr. 297), attended special education classes while in high school (Tr. 297-98), and had past relevant work experience as a kitchen helper, factory laborer, and director of a day care business, which she ran from June 1994 until July 2000 (Tr. 98, 298, 300, 313).

*Plaintiff's Physical Health*

In July 2000, Plaintiff went to Dodson Avenue Health Clinic for complaints of back and right hip pain (Tr. 237). An x-ray of her right hip was normal (Tr. 236).

In October 2000, Walter King, Jr., M.D., an orthopedist, examined Plaintiff and found she had decreased ranges of motion in her lumbar spine, and full ranges of motion in her right hip (Tr.146-147). She had normal deep tendon reflexes and muscle strength in her lower extremities, and normal abilities to walk on her heels and toes (Tr. 146-47). An x-ray of her lumbar spine showed narrowing at L4-5 and L5-S1 levels (Tr. 146). Dr. King diagnosed lumbosacral strain and recommended a magnetic resonance imaging ("MRI") scan (Tr. 146).

6

Plaintiff returned to Dr. King five months later, in March 2001, reporting increased problems with her right hip (Tr. 145). Orthopedic treatment notes at that time showed she complained of chronic back pain (Tr. 145). The x-ray of Plaintiff's lumbar spine revealed mild degenerative changes at L4-5 and L5-S1 levels (Tr. 144). The x-ray of Plaintiff's right hip showed no significant abnormalities (Tr. 144). Dr. King opined that Plaintiff could perform sedentary work (Tr. 144).

In July 2001, clinic notes showed Plaintiff complained of back pain, although she was able to bend and touch her knees during the examination (Tr. 234). An MRI of her lumber spine showed slight disc desiccation at the L5-S1 level, but no significant abnormalities (Tr. 233). In October 2001, Dr. King reported Plaintiff sat comfortably in her chair, and transferred to the examination table without difficulty (Tr. 146). She walked without any noticeable limp, and her straight leg raising tests were normal (Tr. 146). She had decreased ranges of back motion, and normal reflexes, sensory responses, and muscle strength in her lower extremities (Tr. 146). Her heel and toe walking was acceptable (Tr. 146). In December 2001, Dr. King stated that Plaintiff had a permanent impairment of 10% of her whole body (Tr. 144).

In February 2002, Dr. King reported Plaintiff's x-rays showed mild straightening of the normal lordotic curve of the lumbar spine, but otherwise she had no significant abnormality (Tr. 143). In March 2003, Plaintiff complained of difficulty sleeping due to pain (Tr. 141). Dr. King reported Plaintiff demonstrated no obvious paraspinal muscle spasms; no exaggerated spine curvatures; full ranges of lumbar spine motion; no tenderness; normal straight leg raising; and normal deep tendon reflexes, sensation, and muscle strength in her lower extremities (Tr. 141-42).

In August 2002, M. Amjad Munir, M.D., examined Plaintiff for complaints of back pain that interfered with her sleep and concentration (Tr. 197-99). According to Dr. Munir, she had decreased

ranges of back motion, but normal ranges of motion in her legs, normal straight leg raising, normal muscle strength in her legs, and normal reflexes in her arms and legs (Tr. 198). Dr. Munir said Plaintiff did not have pain due to degenerative disc disease, but rather was experiencing mostly myofascial (muscle-related) pain (Tr. 198).

In November 2002, David Guan, M.D., evaluated Plaintiff's complaints of sleep disturbances, and Plaintiff told the doctor she was unaware of any snoring or apnea episodes (Tr. 125-26). A recent sleep study revealed very minimal, mild obstructed sleep breathing (Tr.125). Plaintiff used a continuous positive air pressure ("C-PAP") machine (Tr. 125). Dr. Guan stated the clinical findings suggested Plaintiff's major problem was poor sleep hygiene, back pain, and nose problem and he believed the C-PAP machine was going to be of little value (Tr. 125).

In March 2003, W. Carl Dyer, M.D., an orthopedic specialist, examined Plaintiff and found she had a slight restriction of back motion and atrophy of the paraspinal muscles (Tr. 251). She showed no signs of a focal neurological deficit (Tr. 251). X-rays of Plaintiff's lumbar spine revealed narrowing of the L5-S1 interspace (Tr. 251). Dr. Dyer diagnosed lumbar strain and myofascial contracture of the lumbar spine (Tr. 251). The doctor recommended range of motion exercises and prescribed Celebrex (Tr. 251). On a follow-up visit in May 2003, Dr. Dyer recommended a home exercise program and a series of epidural steroid injections (Tr. 250). Examinations showed restricted ranges of motion and atrophy of the lower back muscles (Tr. 249-51).

In December 2003, Emelito Pinga, M.D., an examining physician, evaluated Plaintiff's physical condition (Tr. 261-71). Plaintiff had no problem getting out of a chair and onto an examining table (Tr. 263). Plaintiff had a slight decrease in her ranges of motion in her neck, shoulders, elbows, wrists, and hips, and she had no spasms, tenderness or abnormal spine curvature

8

in her back (Tr. 264-65). She had normal muscle strength in her hands, arms, and legs and no impairment in her ability to walk (Tr. 265). Her lower extremities were normal (Tr. 265). Dr. Pinga opined Plaintiff could sit for six hours, stand for four hours, lift fifteen pounds occasionally, and lift five to ten pounds frequently (Tr. 265). She could occasionally climb, balance, kneel, crouch, crawl, and stoop (Tr. 265, 267).

In January 2004, Dr. Dyer recommended Plaintiff "walk a mile a day" and prescribed Naprosyn (Tr. 72). In February 2004, a bone density test was normal (Tr. 72). She had atrophy of her back and thigh muscles (Tr. 72). X-rays showed narrowing of her lumbosacral interspaces (Tr. 72). In February and March 2004, the doctor prescribed physical therapy and a home exercise regimen focusing on her back and legs (Tr. 72).

*Plaintiff's Mental Health*

In July 2001, Plaintiff underwent an intake assessment by Dr. Roy Regan,[1] a licensed clinical social worker, prior to receiving treatment for depression at Fortwood Center (Tr. 164-65). She complained of crying spells, disturbed sleep and poor appetite (Tr. 164). She was well-groomed, and had good hygiene, a cooperative attitude, and relaxed mood (Tr. 165). Her mood was depressed, and her affect was tearful (Tr. 165). She was oriented to person, place, and time (Tr. 165). She complained of poor concentration and memory (Tr. 165). She had a Global Assessment of Functioning (GAF) of 60, indicating moderate impairment of functioning (Tr. 165).[2]

---

[1] As suggested by the Commissioner, the signature appears to confirm Bud Regan and Roy Regan are the same person (Tr. 57, 165).

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., test rev. 2000). The GAF scale ranges from 100 (highest level of functioning) to 1 (lowest level of functioning; most danger to self or others). *Id.* at 34.

In September, October, and November 2001, she complained of hopelessness and helplessness due to a lack of finances (Tr. 189-90). In December 2001, Plaintiff reported medications helped her symptoms, and she denied having any problems with memory or concentration (Tr. 188). In May 2003, she reported a significant improvement in her mood due to scheduling a disability hearing date (Tr. 149). In September 2003, she complained of increased depression, and she stopped taking her prescribed medications (Tr. 63). In October 2003, after she resumed her prescribed medication regimen, she reported a good mood, happiness, contentment, and enjoying life (Tr. 62). In December 2003, Plaintiff's depression was reported to be stable when she complied with her prescribed anti-depressant regimen (Tr. 61).

In December 2003, Benjamin James Biller, M.S., a licensed psychological examiner, evaluated Plaintiff's mental condition (Tr. 252-60). Plaintiff was polite and cooperative during the evaluation, had good grooming, appropriate dress, and appropriate behavior (Tr. 252). Plaintiff told the psychological examiner she had depression, difficulty concentrating, and an erratic sleep pattern due to back pain and sleep apnea (Tr. 253). She denied having crying spells, panic attacks, or manic symptoms (Tr. 253). She reported her disability was due to "degenerative disc diseases, hip problems, allergies, ulcers, and sleep apnea" (Tr. 254). She was able to prepare meals, make beds, sweep floors, wash dishes, and do laundry, but not for long periods of time due to physical pain (Tr. 255). Plaintiff was able to understand and remember work-like procedures and simple and detailed instructions (Tr. 255-56). She was able to sustain concentration, persist at tasks, interact with peers and supervisors, and adapt to changes (Tr. 256). The psychological examiner rated her GAF as 65, indicating mild impairment of functioning, and diagnosed an adjustment disorder with mixed anxiety, and a depressed mood (Tr.256).

10

In February 2004, Michael O'Hanlon, a psychologist, completed a mental assessment of functioning form (Tr. 58-59). Dr. O'Hanlon stated Plaintiff would "probably not" have problems with simple, one and two step processes (Tr. 58). She would have two absences a month, and had a fair ability to get along with other people (Tr. 58-59). Dr. O'Hanlon stated some people are able to handle a full time job with a GAF of 60 (Tr. 59).

In April 2004, Dr. Bud Regan completed a mental assessment of functioning questionnaire (Tr. 56-57). Dr. Regan indicated he saw Plaintiff for post traumatic stress disorder (Tr. 56). According to Dr. Regan, Plaintiff lost her feeling of safety, which affected her ability to concentrate and focus on complex tasks (Tr. 56). Dr. Regan stated Plaintiff was able to perform simple, one and two step processes, but she was unable to sustain such processes over time (Tr. 56). Dr. Regan described Plaintiff as highly emotional and reduced to crying episodes frequently (Tr. 56). He estimated the Plaintiff might have five absences a month from work (Tr. 56). She was able to deal with the general public for short periods, but longer eight-hour periods might cause problems (Tr. 57). Difficult or aggressive coworkers would exacerbate her fears, and a demanding supervisor would also probably trigger her fears (Tr. 57). Dr. Regan Plaintiff's psychological problems made her unable to work (Tr. 57).

*Medical Expert's Testimony*

At Plaintiff's administrative hearing, Edward Griffin, M.D., reviewed Plaintiff's medical records and testified many evaluations of Plaintiff showed no evidence of disabling degenerative disc disease or other significant lumbar spine problems (Tr. 321). Dr. Griffin explained that the record showed no clinical abnormality of the right hip (Tr. 323-34). Dr. Griffin also testified the physical evaluations did not show any basis for limitations of Plaintiff's abilities to sit, stand,

11

walk, bend, stoop, or squat (Tr. 322). According to Dr. Griffin, Plaintiff was able to lift 30 to 35 pounds occasionally, and 15 pounds frequently (Tr. 323). Dr. Griffin testified Plaintiff's conditions, as shown by the record, were not capable of producing the degree of pain Plaintiff alleged (Tr. 325).

*Vocational Expert Evidence*

At the Plaintiff's first hearing in June 2003, Robert Bradley testified as a vocational expert (Tr. 310-12, 314-15). Mr. Bradley stated Plaintiff's first job as a kitchen helper was classified by the DOT as medium, unskilled and that her second job as a general laborer was likewise classified as medium and unskilled. (Tr. 310). According to Mr. Bradley, Plaintiff's third job as a daycare director fell into the category of medium exertion and semi-skilled labor (Tr. 310,315). Mr. Bradley classified Plaintiff's last job as an SVP-3 to -4, leaning to an SVP-4 due to the length of time she worked as a daycare director, but stated none of Plaintiff's previous skills would be transferable to sedentary work (Tr. 315).

At Plaintiff's second hearing in April 2004, Dr. Van Freedlove testified as a vocational expert (Tr. 329-34). Dr. Freedlove agreed with Mr. Bradley's previous assessments of Plaintiff's first two jobs (Tr. 329). Also, Dr. Freedlove stated, while a daycare director was normally considered sedentary, given Plaintiff's testimony, he considered it to be medium instead (Tr. 330). While the Plaintiff could not return to any of the previous positions, there were available positions requiring only light work and simple, one-and-two-step procedures (Tr. 330). Dr. Freedlove opined Plaintiff could work as a cashier or as a production inspector, of which there were approximately 8,000 and 1,300 jobs in the region, respectively (Tr. 330-31).

On cross-examination, Dr. Freedlove agreed employers would not tolerate crying spells once or twice per week at the jobsite during work hours (Tr. 333). Further, Dr. Freedlove answered neither

12

of the jobs he suggested nor any "competitive employment" would allow an employee to lay down and rest during the work shift (Tr. 334).

*Plaintiff's Testimony*

The Plaintiff testified at both her hearings (Tr. 297-309, 311-14, 327-29). She stated she closed her day care business on July 1, 2000, a few weeks after a physical altercation with her two landlords, one of whom was arrested, but never convicted, as a result of the incident (Tr. 301-02). Plaintiff was pushed into a door, hitting the doorknob and "kind of twisted [her] back some kind of way and...went back on the floor" (Tr. 301). Since the landlord incident, Plaintiff has suffered from migraine headaches, depression, back and spinal pain, arthritis, swelling, as well as pain from both feet, her arms, one hand and her hip (Tr. 302-03). Plaintiff testified the pain "travels all the way up to my spine in the back of my head and give[s] me a lot of migraine headaches" (Tr. 303). In addition, Plaintiff testified to suffering from a sleeping disorder (Tr. 303).

As a result of these physical problems, Plaintiff spends most of her time laying down (Tr. 304). After only eight to twelve minutes of standing or walking, her back feels as if it is "about to give out" (Tr. 304). Her back problems limit her ability to lift, and while she could lift a whole gallon of milk, she could not lift that much weight often (Tr. 305).

Plaintiff stated that she uses a "C-pap" machine to help her sleep, but she still felt fatigue most of the time (Tr. 306-07). While she can do some minor housework and pick up a few items at the grocery store, she cannot clean her home or do her grocery shopping without the assistance of a friend or family member (Tr. 307-08). The use of steroid injections did not help her back, but she treated her migraine headaches with Tylenol and her back pain with a heating pad (Tr. 303-04).

As to her mental health, Plaintiff had been going to Fortwood for counseling for depression

13

for approximately three years (Tr. 302). Once or twice per week she has crying spells that last about thirty minutes, after which she has to lay down (Tr. 308). Plaintiff sometimes feels like she cannot get out of the house, and, as a result of her depression and physical problems, she is only able to leave her house about once per week (Tr. 308-09).

<u>Analysis</u>

The ALJ applied the five-step sequential evaluation and found Plaintiff was not disabled during the relevant time period because Plaintiff's severe impairments would not prevent her from performing sedentary work (Tr. 18-19).

1. <u>Plaintiff's First Argument: The ALJ Did Not Fully and Fairly Develop the Record</u>

The Plaintiff argues the failure by the ALJ to require requested intelligence testing resulted in a record that was neither fairly nor fully developed. Pl. Br. at 4-5. Plaintiff argues the "ALJ indicated he was ordering psychological testing implicitly to include intelligence quotient ("IQ") testing and...there [wa]s some cause to believe that IQ could be relevant in the case...." *Id*. at 5.

The following is an exchange between Plaintiff's counsel and the ALJ at the June 2003 hearing as reflected in the transcript:

> Attorney: ....Your Honor, because of the special ed do you think it might be a good idea to order intelligence--
>
> ALJ: Well, I'm having testing done. Let me just--so now I've called her and I've written it down so we'll see how that works out there. I'm going to do--just so you know I'm going to do an intern and send all the medicals and medication forms, psychological with testing. All right?

(Tr. 310). Because no IQ test was conducted and Plaintiff had reported taking some special education classes in school, Plaintiff argues the ALJ failed to fully and properly develop the record by ruling

14

on the case without the results of IQ testing [Pl. Br. at 5].

It is the duty of the ALJ to develop a reasonable record and the ALJ must look fully into the issues. 20 C.F.R. §§ 404.944 and 416.1444; *Johnson v. Secretary of Health and Human Servs.,* 794 F.2d 1106, 1111 (6th Cir.1986). The ALJ has a duty to develop an adequate record to support his decision. *Born v. Secretary of Health and Human Servs*., 923 F.2d 1168 (6th Cir.1990). However, the burden of providing a complete record, defined as evidence complete and detailed enough to enable the Commissioner to make a disability determination, rests with the claimant. *Landsaw v. Secretary of Health and Human Servs*., 803 F.2d 211, 214 (6th Cir.1986).

In making the disability determination, the ALJ does not bear the sole responsibility in the investigation process. *See Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so"). After a review of the record evidence, it is within the province of the ALJ to decide when there is enough information. *See* 20 C.F.R. § 404.1512(e) (if the evidence is not sufficient, the agency asks for additional information).

The regulations do consider intelligence tests as "essential to the adjudication" of many cases relating to the cognitive abilities of the claimant. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.06(b). Such intelligence tests can help show "the presence of mental retardation or organic mental disorder, as well as the extent of any compromise in cognitive functioning." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.06(a). While intelligence tests remain valuable tools, they "are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.06(a).

The regulations require that in establishing a mental retardation diagnosis, evidence of such a condition must have manifested during the developmental period, which it defined as before age twenty-two. 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.05. While Listing 12.05(c) allows lower than average IQ scores to be combined with other mental and physical limitations to allow a claimant to succeed in a disability claim, it does not excuse the claimant from showing the mental impairment existed before age twenty-two. 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12.05. Although other mental impairments exist that allow determinations of disability besides a low IQ, scores are closely connected with Listing 12.05 and its requirement that evidence of such impairment must exist before age twenty-two. 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.06(a) and (b), 12.05.

The Supreme Court has emphasized that "for a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990) (emphasis in original). The Sixth Circuit in *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001), a case also involving adult mental retardation, held that a claimant must show not only the requisite IQ score and additional impairment, but also must demonstrate mental retardation in order to be found disabled under the mental retardation Listing of 12.05. *See also* 20 C.F.R. §§ 404.1525(c)-(d); *King v. Heckler*, 742 F.2d 968, 973-74 (6th Cir. 1984). It is insufficient that a claimant comes close to meeting the requirements of a listed impairment. *See Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986). Thus, if a claimant fails to meet one of the requirements for mental retardation, such as a lack of evidence of the impairment before age twenty-two, the claim will fail. *See Brown v. Sec'y of Health & Human Servs.*, 948 F.2d 268 (6th Cir. 1991) (it is essential that plaintiff demonstrate that his low IQ manifested itself prior to age 22); *Kershaw v. Sec'y of Health & Human Servs.*, No. 93-4357, 1995 WL 19372, slip op. at *1 (6th Cir. Jan. 18, 1995) (citing *Brown*).

16

The Plaintiff argues the ALJ "recognized" "intelligence testing was needed in this matter" because there was "some cause to believe that IQ could be relevant in the case." [Pl. Br. at 5]. However, the Plaintiff's reference to a combination of low IQ and other impairments specially allowed by Listing 12.05(c) fails to account for the first paragraph of Listing 12.05 which requires evidence of manifestation before age twenty-two. The ALJ did not directly address IQ scores, but he found the Plaintiff suffered only a "moderate impairment in functioning" that lessened when she took her medications (Tr. 14-15). Therefore, the Plaintiff does not meet the criteria of Listing 12.05(c) because no physician, treating or otherwise, made a diagnosis of mental retardation, before or even after age twenty-two.[3]

The psychological testing ordered by the ALJ after the first hearing in 2003 indicates the Plaintiff suffered from moderate levels of anxiety and depression (Tr. 256). Notwithstanding those problems, the Plaintiff appeared able "to understand and remember locations and work-like procedures and understand and remember simple and/or detailed instructions." (Tr. 256). In addition, the Plaintiff seemed to be able "to adapt to changes in the work environment and to be aware of hazards and travel unaccompanied in unfamiliar places or use public transportation" (Tr. 256). While the Plaintiff was not able to subtract serial three's from twenty, she got ninety-five percent of the questions correct on her Pfeiffer Mental Status Evaluation, which was described as "adequate and indicates she is oriented as to time, place, and person" (Tr. 255-56). Thus, while Plaintiff appeared to be limited somewhat by her depression and anxiety, judging by her mental evaluation, those

---

[3] During her application for disability, the Social Security Administration apparently lost the Plaintiff's file; however, her file was reconstructed, and none of the records known to be in the lost file contained any reference to mental retardation that might be indicated by low IQ scores (Tr. 110-13).

17

limitations bear little, if any, relation to intelligence.  That Plaintiff reported attending some special education classes while she was in school did not necessarily warrant IQ testing, especially considering she graduated from high school, ran her own business for six years, and did all the billing for that business.  As a result, given the requirements of Listing 12.05 that mental retardation manifest before age twenty-two, as well as the Plaintiff's own test results and work history, ordering IQ tests likely would have been fruitless.

The ALJ did order two additional consultative exams, the results of which were disclosed to Plaintiff's counsel in January 2004, three months before the second hearing (Tr. 115, 319).  At the supplemental hearing in April 2004, the Plaintiff had an opportunity to testify in greater detail about her mental condition, to call witnesses in her behalf, and produce additional evidence that might support a mental impairment claim under Listing 12.05(c) (Tr. 115).  The Plaintiff did not give any relevant testimony, did not call any witness, and did not produce any other evidence at the supplemental hearing about a low IQ or any other mental impairment relevant to Listing 12.05(c) (Tr. 319-34).[4]

The ALJ acted reasonably in ordering additional consultative exams, granting a supplemental hearing, but not ordering an IQ test where the Plaintiff did not provide evidence of mental retardation manifested before age twenty-two.

2.     Plaintiff's Second Argument: The ALJ Did Not Properly Weigh Treating Opinion Evidence

---

[4] While the Plaintiff's GAF is not addressed in her brief, her GAF was rated by Dr. Regan at 60 (Tr. 9-10) and by the consultative psychological examiner at 65 (Tr. 256).  A GAF of 60 does not necessarily indicate a severe mental impairment, only "moderate symptoms or moderate difficulty in social, occupational or school functioning."  *Munson v. Comm'r of Soc. Sec.*, 217 F. Supp.2d 162, 165 (D. Me. 2002).

18

The Plaintiff contends that the ALJ improperly rejected the treating opinion of the licensed clinical social worker, Dr. Regan, in favor of the consultative psychological examiner, Mr. Benjamin Biller. [Pl. Br. at 5-7]. First, Plaintiff argues the ALJ erred in referring to a licensed clinical social worker as "not an acceptable medical source." [*Id.* at 4-5] (quoting from ALJ's findings at Tr. 16). Plaintiff asserts the opinions of Dr. Regan, a social worker, might not have been an appropriate medical source, but neither were the conclusions of Mr. Biller, the psychologist consulted in tests ordered by the ALJ. [*Id.*] Plaintiff also asserts, if neither Dr. Regan nor Mr. Biller satisfied the treating sources' requirements, the ALJ erred by rejecting the opinions of Dr. Regan in favor of those of Mr. Biller, because Dr. Regan had been "treating" the Plaintiff since July 2001, and Mr. Biller had seen the Plaintiff only once, and thus Dr. Regan was in a better position to evaluate the long-term mental health of the Plaintiff. [*Id.* at 5-6].

It is well settled that opinions of treating physicians, because of their longitudinal history of caring for patients, are entitled to great weight and are generally entitled to greater weight than contrary opinions of consulting physicians who have examined a claimant only once. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997); *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). *See also*, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."). However, a treating physician's opinion is not entitled to controlling weight, and may be given little weight, if it is inconsistent with other substantial evidence or is not well-supported by the objective medical evidence. *Cutlip v. Sec'y*

19

*of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). The Sixth Circuit has held "the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified . . ." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988) (holding that the ALJ properly gave no deference to treating physician's opinion that was not supported by objective medical evidence). *See also* 20 C.F.R. §§ 404.1527(d) and 416.927(d).

The relatively high degree of deference given to treating sources applies to physicians and certain other medical professionals enumerated in the C.F.R. 20 C.F.R. § 404.1513 (a) and 404.1527(d)(2). In fact, some evidence from treating sources is necessary because, "We *need* evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s)." 20 C.F.R. § 404.1513 (a) (emphasis added). On the other hand, social workers fall into a category of "other sources" which may be consulted "[I]n addition to evidence from the acceptable medical sources in paragraph (a) ...." *Bird v. Apfel*, 43 F. Supp.2d 1286, 1291 (D.Utah 1999); *Boyette v. Apfel*, 8 Fed. Appx. 429, 433 (6th Cir. Apr. 24, 2001); 20 C.F.R. § 404.1513 (d). A licensed clinical social worker, even one with a doctoral degree, is not specifically listed as an acceptable medical source; therefore, such a source seems to fall in the category of medical sources not listed in paragraph (a). Given an ALJ can, with an explanation as to why, reject the treating opinion of a mandatory medical source, an ALJ can certainly reject the treating opinion of an optional medical source.

Additionally, an ALJ does not accept a physician's opinion that is based solely on a claimant's subjectively claimed limitations. *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990). It is the ALJ's duty to consider, among other things, whether there are any

inconsistencies between the claimant's statements and the rest of the evidence including, but not limited to, medical signs and laboratory findings, physicians' statements, and the claimant's activities. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Because the ALJ is charged with the responsibility of observing the demeanor and credibility of the witness, his conclusions should be highly regarded. *Walters*, 127 F.3d at 530; *Villarreal v. Sec'y of Health and Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).

In the present case, the ALJ gave reasons for not accepting the opinion of Dr. Regan who concluded the Plaintiff was unable to work (Tr. 16). The ALJ wrote, "Although I have *considered* his [Dr. Regan's] opinion, a licensed clinical social worker is not an acceptable medical source. Therefore, his opinion is entitled to *less* weight" (Tr. 16) (emphasis added). The ALJ articulated reasons for discounting the statements of Dr. Regan. The ALJ based his decision on the opinion of the psychological examiner, Mr. Biller, as well as the other treating and consulting sources all of whom concluded Plaintiff had severe impairments in functioning, but she did not have an impairment or combination of impairments that satisfied the requirements of Appendix 1, Subpart P, Regulation No. 4 of the C.F.R. (Tr. 12-17). The ALJ found "the claimant's mental health source stated her depressive symptoms were related to her perceived physical problems, and not psychological in nature" (Tr. 16). The ALJ decided the objective medical record as well as the Plaintiff's own failure to always follow up with scheduled medical appointments or prescribed medications filled did not support her subjective claims (Tr. 16-17). The ALJ stated "the record fails to show objective evidence to substantiate the degree of pain alleged by the claimant" (Tr. 17). Additionally, the ALJ noted that progress notes from 2003 showed higher levels of depression when the Plaintiff failed to follow her prescribed medication regiment, but she was much more stable when she took her

prescribed antidepressants (Tr. 15). Therefore, the ALJ concluded the opinions of Dr. Regan, a licensed clinical social worker, conflicted with the conclusions of the physicians and psychological examiners who opined that the Plaintiff could perform sedentary work (Tr. 13-19).

In reviewing all the mental health and other medical evidence together, much of which might not have been available to Dr. Regan in his capacity as a social worker, the ALJ came to a conclusion different from Dr. Regan's opinion (Tr. 17-18). Despite Dr. Regan's treatment relationship with the Plaintiff, his opinion differed from other sources, was not supported by the objective medical record as a whole, and the ALJ explained his reasoning for adopting the opinion of Mr. Biller over that of Dr. Regan. The issue of disability is reserved exclusively for the Commissioner, and it is the ALJ's duty to assess medical opinions and other evidence. 20 C.F.R. § 404.1527(e). Therefore, I find substantial evidence supports the ALJ's decision.

## Conclusion

Having carefully reviewed the administrative record and the briefs of the parties filed in support of their respective motions, I conclude that there is substantial evidence in the record to support the findings of the ALJ and the decision of the Commissioner denying the Plaintiff's applications for benefits. Accordingly, it is **RECOMMENDED**[5]:

1.    The Plaintiff's motion for judgment on the pleadings [Doc. No. 16] be
      **DENIED**;

---

[5] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7, (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

2. The Defendant's motion for a summary judgment [Doc. No. 19] be **GRANTED**;

3. A judgment be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure **AFFIRMING** the Commissioner's decision which denied benefits to the Plaintiff; and;

4. This action be **DISMISSED**.


s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE